1
2
3
4
5
6
7
8                    IN THE UNITED STATES DISTRICT COURT

9                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11   GEORGE MOSKOWITE,                      No. C-03-4666 MMC

12              Plaintiff,                   **ORDER DENYING PLAINTIFF'S MOTION
                                            FOR JUDGMENT UNDER RULE 52;**
13        v.                                **GRANTING DEFENDANT'S CROSS-
                                            MOTION FOR JUDGMENT UNDER RULE
14   EVEREN CAPITAL CORPORATION             52; GRANTING DEFENDANT'S MOTION
     GROUP DISABILITY INCOME PLAN,          TO STRIKE; FINDINGS OF FACT AND**
15                                          **CONCLUSIONS OF LAW**
              Defendant
16   _____/      [Docket Nos. 86, 90, 94]

17

18        Before the Court are (1) plaintiff George Moskowite's motion for summary judgment

19   and (2) defendant Everen Capital Corporation Group Disability Income Plan's cross-motion

20   for summary judgment, each brought pursuant to Rule 56 of the Federal Rules of Civil

21   Procedure.  The parties request that the motions be considered as having been brought

22   under Rule 52.[1]  Having considered the papers filed in support of and in opposition to the

23   motions, the Court hereby rules as follows.

24                                   **BACKGROUND**

25        On March 10, 1996, plaintiff, then employed by Everen Securities as an Investment

26

27        [1]After the parties had filed their motions, plaintiff requested an opportunity to take
     further discovery, which request was granted.  (See Second Discovery Order, filed
     November 21, 2006.)  Following the completion of discovery, the parties, in August 2007,
28   filed supplemental briefing in support of their respective motions, in which the parties made
     the above request.

Consultant, was injured in an automobile accident.  (See Claim File ("CF") 975-76, 1023, 1054.)[2]  On October 24, 1997, plaintiff filed with defendant a Disability Claim Form, seeking long-term disability benefits under an employee benefits plan.  (See CF 1023.)[3]  In his claim form, plaintiff stated his "illness/injury" began March 10, 1996 as a result of the automobile accident, and that his last date of employment had been April 28, 1997.  (See CF 1023.)  In an accompanying physician's statement, plaintiff's treating physician Stephen C. Spreiter, M.D. ("Dr. Spreiter"), described plaintiff's diagnosis as "Thoracic Disc Syndrome[;] Depression," and stated plaintiff had "Sudeck's Atrophy" in his right wrist, (see CF 1024;[4] Dr. Spreiter opined that plaintiff had a "moderate limitation of [his] functional capacity" and was "able to engage in only limited stressful situations and engage in only limited interpersonal relations," (see CF 1025).

On December 29, 1997, plaintiff informed defendant he could not sit for more than 30 minutes and that driving was "difficult."  (See CF 969.)  On January 5, 1998, defendant received a Physical Capacities Form from plaintiff's treating physician, in which said physician[5] opined that plaintiff, during an 8-hour day, could spend 10% of the time sitting, 10% standing, 10% walking, 10% typing, 10% lifting ten pounds or less, 10% carrying such weight, and 10% driving.  (See CF 963.)

On January 6, 1998, defendant approved plaintiff's claim for long-term disability benefits, finding plaintiff had shown that, as of April 28, 1997, he was unable to perform the duties of his occupation, and, consequently, was entitled to long-term disability benefits,

---

[2]The administrative record, specifically, the "claim file," consists of the following documents:  (1) CF 1-1059 (Exhibit B to the Declaration of Lisa Jellerson Gray, filed October 7, 2004); (2) G-1-24 (Exhibit G to the Gray Declaration); and (3) CF 2103-14 (attached to Declaration of Robert J. Rosati, filed January 13, 2006).

[3]Prior to October 24, 1997, plaintiff had applied for and had been receiving benefits under a short-term disability policy issued by defendant.  (See CF 1038.)

[4]Earlier, in support of his claim for short-term disability benefits, plaintiff had submitted to defendant evidence that he underwent right wrist arthroscopic surgery on April 28, 1997.  (See CF 1056.)

[5]The signature on the form is illegible.  (See CF 963.)

effective October 24, 1997.  (<u>See</u> CF 961-62.)[6]

On May 11, 1998, plaintiff underwent an operation, specifically, an "attempted thoracoscopic discectomy converted to open right thoracotomy with discectomy and fusion," to address plaintiff's "[d]iscogenic disease, T11-12."  (<u>See</u> CF 884.)  On July 28, 1998, plaintiff's treating physician, James Reynolds, M.D. ("Dr. Reynolds")[7], stated on a Restrictions Form that plaintiff's diagnosis was "arthrodesis," that radiographs of plaintiff's back "demonstrate[d] adequate graft placement," and that plaintiff "could be able to return to work approximately 04-02-99," noting that plaintiff's reported "pain [was] more a surgical type of back pain rather than his typical stabbing localized thoracic pain."  (<u>See</u> CF 857.) Several months later, however, on February 3, 1999, Dr. Reynolds completed a second Restrictions Form in which he opined that plaintiff was "totally disabled" through July 24, 1999, for the reason that "imaging studies" conducted in November 1998 showed "there [was] a small degree of fusion at T11-12, but not significant," and that he was "not certain as to whether this will fuse or not."  (<u>See</u> CF 818, 820.)

On March 24, 1999, plaintiff underwent a second surgery on his back, specifically, a "posterior fusion, T11-12."  (<u>See</u> CF 731.)   After the second surgery, Dr. Reynolds noted that plaintiff had "quite a bit of trouble with pain control" and was prescribed OxyContin. (<u>See</u> CF 732.)  At the time plaintiff was discharged, Dr. Reynolds advised plaintiff to continue to take OxyContin "as well as other medications he came in on and a short-acting narcotic for break-through pain."  (<u>See</u> <u>id</u>.)  Additionally, Dr. Reynolds advised plaintiff to "avoid any lifting or twisting."  (<u>See</u> <u>id</u>.)

On May 3, 1999, defendant notified plaintiff that under the terms of the disability plan, plaintiff would be ineligible for benefits as of October 25, 1999, unless plaintiff was unable to perform "any occupation," as defined in the plan.  (<u>See</u> CF 801.)  Thereafter, at

---

[6]Plaintiff received short-term disability benefits through October 24, 1997.  (<u>See</u> CF 1038.)

[7]Dr. Reynolds is an orthopedic surgeon, (<u>see</u> CF 857), who began treating plaintiff in March 1997, (<u>see</u> CF 780).

defendant's request, plaintiff sent defendant an Activities Questionnaire, dated May 4, 1999, in which plaintiff stated, inter alia, he could not carry groceries from a shopping cart to his car or from a car to his home, he could drive for 5 or 10 minutes and could ride in a car for 20 minutes, he usually left his home once a day, and, on a daily basis, he spent 4 to 6 hours in bed in addition to the 6 to 8 hours he spent sleeping, he sat 30 minutes to 1 hour, he stood 1 to 2 hours, and he was able to walk for 10 to 15 minutes twice during the day. (See CF 796, 799.)

On June 9, 1999, James Talcott, M.D. ("Dr. Talcott"), an orthopedic surgeon, conducted an evaluation of plaintiff in connection with an application for Social Security benefits plaintiff had filed. (See CF 493-95.)[8] Dr. Talcott diagnosed plaintiff with "failed anterior interbody fusion lumbar spine," and opined that as a result thereof, plaintiff would be "incapacitated from gainful employment for at least two years."

On August 5, 1999, Mohinder Kaur, M.D. ("Dr. Kaur") performed an independent psychiatric evaluation, in connection with plaintiff's application for Social Security benefits. (See CF 491-92.) Dr. Kaur opined that plaintiff had "minimal symptoms of depression," did "fairly well on his mental status examination," and had "good judgment." (See CF 492.) Dr. Kaur also opined that plaintiff's "concentration, attention and memory were intact." (See id.) Dr. Kaur further opined that plaintiff had "minimal symptoms of depression," which were "not interfering with his working capabilities." (See id.)

On September 20, 1999, Michael H. Moskowitz, M.D. ("Dr. Moskowitz"), plaintiff's treating psychiatrist since March 1997, (see CF 780), performed a "mental status" examination on plaintiff, and, in a report, stated "[d]epression is present with moderate to high anxiety and no panic attacks," (see CF 530). Dr. Moskowitz noted "moderate and appropriate pain behavior," that plaintiff's reported pain level "remain[ed] high," and that plaintiff, who was taking OxyContin, Dilaudid, and Trazadone, "should be withdrawn [from

---

[8]On September 2, 1999, defendant requested that the Social Security Administration ("SSA") provide copies of certain information in its files, including any "Consultative and Independent Medical Exam Reports," (see CF 760); the SSA provided the requested material on October 25, 1999, (see CF 491-97).

those medications] slowly in the future, once he [had] good control of his pain and his fusion [was] more complete." (See CF 529-30.) Dr. Moskowitz also opined, on a form provided by defendant, that plaintiff had a "significant" degree of restriction on his ability to "cope with work pressure," and a "moderate" restriction on his "attention span," his ability to "concentrat[e]," and on "constriction of interests." (See CF 533.) In the "comments" section of the form, Dr. Moskowitz wrote: "[Plaintiff] is disabled due to his injured thoracic spine and a prior failed fusion, with resultant pain. He is on strong pain medication and this improves the above functions. Stress can still began to [be] overwhelming, at times." (See id.)

On September 28, 1999, a CT scan of plaintiff's lower thoracic spine was taken at the request of Dr. Reynolds, (see CF 321), and interpreted by Betsy A. Holland, M.D., a radiologist, as follows: "An anterior interbody fusion is seen with posterior hardware including pedicular screws at T11 and T12 bilaterally with interconnecting rods. The anterior interbody fusion appears solidly incorporated into the superior endplate of T12. Its incorporation into the inferior endplate of T11 is indeterminate." (See id.) The next day, September 29, 1999, Dr. Reynolds' notes indicate that "imaging studies" demonstrated "some posterior fusion at T10-11." (See CF 325.)

On October 25, 1999, an investigator hired by defendant began surveillance of plaintiff. (See CF 446.) On October 31, 1999, the investigator videotaped plaintiff performing the following activities while wearing a back brace: "walking, entering a vehicle, driving, alighting from a vehicle, bending at the waist, reaching into a vehicle, walking a medium sized dog using a leash, pulling a small wagon, squatting, lifting three medium size pumpkins, and lifting three small pumpkins." (See CF 447.) On November 9, 1999, the investigator videotaped plaintiff performing the following activities while wearing a back brace "some" of the time: "walking, bending at the waist, reaching into a vehicle, carrying a small box, entering a vehicle, and driving." (See id.) On November 30, 1999, the investigator videotaped plaintiff walking, and entering and driving a vehicle while wearing a back brace. (See id.)

5

On November 30, 1999, Thomas Mampalam, M.D. (" Dr. Mampalam") performed, at defendant's request, an independent medical examination of plaintiff. (See CF 459.) In his report, Dr. Mampalam noted that during the examination plaintiff indicated his "posterior thoracic pain" level was on a scale of 1-10, "about '7-8,'" and indicated "all" the pain was "in an area in the posterior spine that is at about T8." (See CF 459.) Dr. Mampalam further noted, however, that during the examination, plaintiff reported no "tenderness of the posterior thoracic spine" in response to "gentle palpation." (See CF 460.) After reviewing plaintiff's medical records, Dr. Mampalam concluded that although the "thoracic CT scan films" taken September 28, 1999 showed the "T11 - T12 instrumentation system" with "partial resorption without solid fusion," the subjective pain reported by plaintiff was "higher in the thoracic spine" where "no abnormality" had been "detected." (See CF 461.) In addressing the topic of "physical limitation, work restrictions, and activity levels," Dr. Mampalam stated:

> Reasonable restrictions after anterior and posterior thoracic discectomies, fusion, and instrumentation would be as follows. He should not lift greater than 35 pounds. He should refrain from frequent bending, stooping, or twisting. These restrictions would be expected to be permanent. [Plaintiff] does not have exertional or nonexertional restrictions of such magnitude that he cannot perform the functions of any relevant work. The patient does have sedentary work capacity. The patient should be able to perform the customary work of [a] stockbroker. Reasonable time off work would be six months after each surgery. Patients usually wear a brace for three to six months after such surgery.

(See CF 462.)

On December 13, 1999, Dr. Reynolds, in response to written questions posed to him by defendant, opined that plaintiff remained unable to perform "sedentary to light activities" because of "pain" and "delayed fusion." (See CF 429.) Dr. Reynolds rated plaintiff's prognosis for "recovery" as "fair," and that he was "unable to assess" the time at which plaintiff could "return to sedentary to light work." (See id.)

On January 5, 2000, Victor Schorn, M.D. ("Dr. Schorn"), a neurological surgeon, conducted, at defendant's request, an independent review of the file. (See CF 388-92.) Dr. Schorn, after reviewing the records and speaking to Dr. Reynolds, plaintiff's treating

physician, prepared a report in which he opined there was "no real objective evidence to account for [plaintiff's] continued symptoms to prevent [him] from sedentary work" and that "most claimants with similar surgery [ ] are at least able to perform sedentary or light work, one month post-op and in fact most are back to full previous work." (See CF 392.) Dr. Schorn also noted there was "no definite objective medical evidence to determine whether the fusion is complete," (see CT 392), and that Dr. Reynolds had advised Dr. Schorn that plaintiff had a "normal neurologic exam." (See CF 392-93.) Dr. Schorn opined that plaintiff "should be able to lift 20 pounds occasionally, 10 pounds frequently, sit, stand and walk for 6 hours out of an 8-hour day and drive 2 hours." (See CF 392.) Dr. Schorn was of the further opinion, however, that plaintiff was "on very high doses of oral narcotics and antidepressants" that would have a "severe impact on his short-term memory and concentration in particular and many other faculties in general," and that would "have a marked negative impact on his ability to perform even the simplest of job duties." (See CF 241).

On January 24, 2000, Dr. Moskowitz, in response to written questions posed to him by defendant, stated he would not decrease plaintiff's pain medications until the fusion was "complete." (See CF 299.) Dr. Moskowitz also indicated that "at every visit," he performed "informal neuropsychiatric evaluations of plaintiff," and was of the view that plaintiff had "no current short term memory problem," but did have "problems with concentration and attention" and "some forgetfulness." (See id.)

On January 31, 2000, plaintiff completed an Activities Questionnaire, in which he described his daily routine as follows: "Wake up, rest for 30-60 minutes after taking pain meds, eat breakfast with daughter & wife. Work on taking care of answering mail, pay bills, etc." (See CF 258.) Plaintiff stated that, during a day, he could drive for one hour, walk one mile in 15-20 minutes, climb one flight of stairs, sit for 1-2 hours, stand for 4-6 hours, wash and fold laundry, go grocery shopping, and cook meals. (See CF 256-57.) Plaintiff also stated he found it "difficult to remember names, times [and] phone calls." (See CF 258.) Additionally, plaintiff reported that he had started receiving Social Security benefits

as of January 2000.  (See CF 255.)  Thereafter, at defendant's request, plaintiff provided defendant with a copy of the SSA's determination that plaintiff was "disabled," for purposes of social security benefits, as of February 1, 1999.  (See CF 202.)

On March 14, 2000, after defendant provided him with a copy of the surveillance videotapes, Dr. Schorn wrote a follow-up report with respect to his opinion as to the effect of plaintiff's medications on his ability to work.  (See CF 251.)  Dr. Schorn noted the videotapes showed plaintiff engaging in standing, walking, bending, squatting or lifting activities without any apparent difficulty and without giving the appearance of being in pain.  (See CF 252.)  Dr. Schorn was of the opinion that plaintiff was able to perform "sedentary to light work duties," and stated, "There appears to be little, if any, reason why this claimant cannot function as a stock broker, or in a similar position."  (See CF 252-53.)  Dr. Schorn also opined that, in light of plaintiff's activities, plaintiff was "not taking the dosage of narcotic, as stated in the medical record, or he has become accustomed to his dosage with minimal, if any cognitive difficulty."  (See CF 251.)  Dr. Schorn concluded that plaintiff "should be able to sit six hours in an eight-hour day, stand and walk six hours in an eight-hour day, stand and walk six hours in an eight-hour day, lift 20 to 25 pounds occasionally, and five to ten pounds, frequently with minimal limitation in his postural abilities."  (See CF 253.)

On April 20, 2000, Joseph Hirsch, Ph.D. ("Dr. Hirsch"), a psychologist, performed an "Independent Medical Evaluation Record Review" of the file.  (See CF 195.)  Dr. Hirsch noted that plaintiff has been prescribed Oxycontin, Dilaudid, and Trazodone.  (See id.)  In response to the question, "Please comment as to whether the type and doses of medication [plaintiff] is taking as well as the length of time they have been administered, is likely to impair decision making, memory, judgment, concentration," Dr. Hirsch responded, "[T]he impairment in cognitive functioning by chronic uses of these specific opioids appears to be minimal, with decreased attention and psychomotor slowing two of the more prominent features."  (See CF 197.)  Dr. Hirsch further opined, "Assuming that the patient is taking prescribed therapeutic dosages of his medications, no drug-related deficits are

8

expected." (See CF 197-98.)  In addition, Dr. Hirsch noted, "decades of research with opioids suggest that there should be minimal cognitive deficits in the drug-tolerant patient maintained on his current therapeutic doses," that "these medications, per se, should not interfere with [plaintiff's] ability to work, in a general sense," but that "[a]s to the more specific issue of performing 8 hours a day as a stockbroker, one needs to consider the possible consequences of decreased attention and psychomotor slowing (which may or may not be present)." (See CF 198.)

On May 10, 2000, the investigator hired by defendant "followed [plaintiff] to a gym, super market and then home," during which times the investigator observed plaintiff "walking, driving, bending at the waist, entering and alighting a vehicle" and "did not see any signs of restriction." (See CF 142.)  On May 11, 2000, the investigator "followed [plaintiff] to a winery, church, and then home," during which times the investigator observed plaintiff "walking, entering and alighting a vehicle" and "did not see any signs of restriction." (See id.)  On May 12, 2000, the investigator "followed [plaintiff] to a bank and a winery," during which times the investigator observed plaintiff "walking, entering and alighting a vehicle" and "did not see any signs of restriction." (See id.)

On May 22, 2000, Mary Paine O'Malley ("O'Malley"), a "Vocational/Disability Consultant," prepared for defendant a "Transferable Skills Analysis" report. (See CF 123-26.)  For purposes of the report, O'Malley assumed plaintiff could perform "sedentary" jobs that "provide the opportunity to change positions from sitting, standing, walking as needed throughout the workday." (See CF 125.)  Based on that assumption, O'Malley opined that five "sedentary occupations appear[ed] to be consistent with [plaintiff's] work experience, skill, and education": (1) "Registered Representative/Stock Broker"; (2) "New Accounts Manager (Mutual Funds, Discount Brokerage firms, Initial Public Offering companies)"; (3) "Financial Planner"; (4) "Investment Analyst"; and (5) "Institutional Trader." (See id.)

Thereafter, on July 6, 2000, defendant informed plaintiff by letter it was discontinuing his long-term disability benefits, effective July 7, 2000. (See CF 95-101.)  Defendant stated therein: "[T]he medical and nonmedical information obtained does not establish

restrictions or limitations of your functional capacity to prevent you from performing your own or any occupation for which you are reasonably fitted by training, education, experience, age and physical and mental capacity."  (See CF 98.)

On July 19, 2000, plaintiff's wife, on behalf of plaintiff, sent defendant a letter "requesting review of [the] denial."  (See CF G-4.)  Attached thereto was a letter written by Dr. Reynolds, dated April 17, 2000 and intended as a response to defendant's March 27, 2000 request for comment on the reports issued by Dr. Mampalam and Dr. Schorn.  (See CF 232, G-4-6.)  In his response, Dr. Reynolds stated his earlier opinion, that plaintiff was "entirely unable to perform sedentary work as a stockbroker or similar position," was unchanged, that he did not believe Dr. Mampalam was "qualified to comment" on plaintiff's "pain syndrome," and that plaintiff's ability to engage in the activities witnessed by the investigator did not support a finding plaintiff "could freely perform the work of a stockbroker, particularly in view of the medications he [was] on."  (See id.)  Thereafter, plaintiff submitted to defendant a letter, dated July 26, 2000, in which Dr. Moskowitz responded to defendant's May 3, 2000 request for comment on the reports issued by Dr. Mampalam, Dr. Schorn, and Dr. Hirsch.  (See CF 168, G-7-10.)  In his response, Dr. Moskowitz stated he agreed with Dr. Reynolds' response dated April 17, 2000, with the exception that he believed plaintiff's inability to "discharge his duties as a stockbroker" was not the result of plaintiff's "medications," other than to the extent the medications could be "perceived" by an employer as a liability.  (See CF G-7-9.)

Both Dr. Reynolds and Dr. Moskowitz subsequently sent defendant additional treatment notes.[9]  The further treatment notes provided by Dr. Reynolds indicate that, on June 22, 2000, plaintiff had reported that, although his pain was "the same," he was "much stronger," (see CF G-21), and that on September 26, 2000, plaintiff again stated his pain was "the same," (see CF G-23).  The September 26, 2000 treatment notes further indicate Dr. Reynolds was of the view that plaintiff would be "totally disabled over the next five

---

[9]The date(s) on which such notes were sent is not reflected in the record.

years." (See CF G-24.)

The additional treatment notes provided by Dr. Moskowitz indicate the following: on January 22, 2000, plaintiff reported that his pain became worse if he was "active," (see CF 2104); on May 18, 2000, Dr. Moskowitz noted plaintiff's spine had "solidly fused," and that plaintiff felt "good about his progress" but reported he could not "consistently perform any task," (see CF 2110); on June 22, 2000, plaintiff stated that some mornings "the pain was so severe that [he didn't] feel like getting out of bed," discussed with Dr. Moskowitz that "it does not seem likely" he could return to work in the "high pressure world of being a stock broker, and, according Dr. Moskowitz, was "still in the place where it [was] hard for him to contemplate anything he could do," (see CF 2113); on December 4, 2000, Dr. Moskowitz determined that plaintiff had "reached a place" where he could "be considered for further functional assessment and rehabilitation," (see CF 86). In these notes, Dr. Moskowitz continued to offer the opinion that plaintiff was "totally disabled." (See CF 86, 2110, 2113.)

On January 4, 2001, defendant advised plaintiff it was adhering to its decision to discontinue plaintiff's long-term disability benefits. (See CF 72-76.) Defendant stated it had conducted further reviews of the file and concluded: "Based upon the results of these reviews, it has been determined that the information contained in your file does not support a level of impairment which would preclude you from performing the duties of your own or any occupation." (See CF 81.)

**DISCUSSION**

Under the plan, "disability" and "disabled" are defined as follows:

i. If the Covered Person is eligible for the 24 Month Own Occupation Benefit, "Disability" or "Disabled" means during the Elimination Period and the next 24 months of Disability the covered Person is unable to perform all of the material and substantial duties of his occupation on an Active Employment basis because of an Injury or Sickness; and

ii. After 24 months of benefits have been paid, the Covered Person is unable to perform, with reasonable continuity, all of the material and substantial duties of his own or any other occupation for which he is or becomes reasonably fitted by training, education, experience, age and physical and mental capacity.

(See Gray Decl. Ex. A at P-006.)

11

1    Plaintiff contends defendant abused its discretion in discontinuing his long-term

2    disability benefits as of July 7, 2000.[10]  In other words, plaintiff contends, defendant erred in

3    finding plaintiff, as of July 7, 2000, was able to perform "his own or any other occupation"

4    for which he is "reasonably fitted."  (See id.)

5    **A. Motion to Strike**

6        In support of his motion, plaintiff offers 128 pages of exhibits.  (See Rosati Decl.,

7    filed January 13, 2006.)  Defendant moves to strike all but 12 pages of plaintiff's exhibits.[11]

8        The first group of exhibits challenged by defendant are discovery requests

9    propounded and responses thereto served during the instant civil action, as well as copies

10   of correspondence between counsel.  Plaintiff does not explain why such exhibits are

11   relevant to the issue of whether defendant abused its discretion by discontinuing plaintiff's

12   benefits, and the relevance is not apparent.  Consequently, such exhibits, specifically,

13   those marked by plaintiff as CF 2000-2060 and CF 2115-2127, will be stricken.

14       The second group of challenged exhibits are copies of documents defendant

15   previously submitted as part of the administrative record.  Although the documents are

16   relevant in that they are part of the record, plaintiff fails to explain why a document already

17   in the administrative record needs to be re-submitted and, as plaintiff has done, stamped

18   with a different identifying number.  To avoid any possible confusion that may arise from

19   such duplication, the subject exhibits, specifically, those marked by plaintiff as CF 2061,

20   2065-77, and 2079-95, will be stricken as duplicative.

21       The third group of challenged exhibits are documents that pertain to the calculation

22   of plaintiff's Social Security benefits.  Plaintiff submits, and defendant agrees, that such

23   documents are relevant to the issue of remedies, an issue the Court has previously found

24   to be premature.  (See Order, filed February 1, 2006, at 2:19, 27-28.)  Because plaintiff

25   

26       [10]By order filed August 10, 2005, the Court found defendant's decision to discontinue
     benefits is properly reviewed for abuse of discretion.

27       [11]Defendant concedes the exhibits marked by plaintiff as CF 2103-14 were in the
28   claim file but were subsequently lost, and, as such, "are part of the administrative record."
     (See Def.'s Obj. and Mot. to Strike, filed January 20, 2006, at 6:1-2, 22-24.)

does not argue such documents are relevant to the question of whether defendant abused its discretion in discontinuing benefits, such exhibits, specifically, those marked by plaintiff as CF 2096-2102, are not relevant to the instant motions, and will be stricken without prejudice.

Finally, defendant argues the Court should strike two exhibits that plaintiff states were sent to, and subsequently lost by, defendant. Such exhibits have been marked by plaintiff, respectively, as CF 2062-2064 and CF 2078. The first of these exhibits is an "Activities Questionnaire" completed by plaintiff and dated February 2, 2000; the second is an undated and unsigned one-page typewritten document that appears to be a narrative by plaintiff of his daily activities. In support of his argument that such documents are properly included in the administrative record, plaintiff relies solely on a declaration by his counsel, who states the documents were "submitted by [p]laintiff Moskowite or his doctors as part of his claim or appeal." (See Rosati Decl., filed January 13, 2006, ¶ 3.) Plaintiff's counsel fails, however, to state he has personal knowledge of such submission, let alone the basis for any asserted personal knowledge. Further, plaintiff fails to offer any objective indicia of mailing, for example, a certified mail receipt or fax receipt. As a result, plaintiff has failed to offer admissible evidence to support a finding that either of the above-referenced two documents were, in fact, provided to defendant. Cf. Schikore v. BankAmerica Supplemental Retirement Plan, 269 F. 3d 956, 962 (9th Cir. 2001) (holding "common law mailbox rule," under which "proper and timely mailing of a document raises a rebuttable presumption that the document has been received by the addressee in the usual time," applies in ERISA cases where receipt of document is in dispute).[12] Consequently, plaintiff

---

[12]In moving to strike said documents, defendants offer the declaration of Lisa Jellerson Gray ("Gray"), who handled the appeal for defendant. With respect to the completed Activities Questionnaire, Gray states that she "does not believe" such document was part of the claim file, (see Gray Decl., filed January 13, 2006, ¶ 11), and, with respect to the one-page typewritten document, that she "[does] not recall ever seeing this document during the appeal, nor is it referenced in any of the claim notes," (see id. ¶ 9). Because plaintiff has not met his initial burden to prove said documents were mailed to defendant, the Court does not reach the question of whether defendant's evidence is sufficient to rebut the presumption of receipt arising from a mailing.

has not shown said documents are properly considered part of the administrative record, and they will be stricken.[13]

Accordingly, defendants' motion to strike the documents marked by plaintiff as CF 2000-2102, and 2115-27 will be granted.

**B. Plaintiff's Claim for Benefits**

After the parties filed their respective motions for summary judgment, the Ninth Circuit, in <u>Abatie v. Alta Health & Life Ins. Co.</u>, 458 F. 3d 955 (9th Cir. 2006), announced the rule that where, as here, "the wording of the plan confers discretion on the plan administrator" and "the plan administrator has a conflict of interest," an "abuse of discretion review, tempered by skepticism commensurate with the plan administrator's conflict of interest, applies." <u>See</u> <u>id.</u> at 959. As the Ninth Circuit further observed therein, the district court, in reviewing the record for abuse of discretion, is "making something akin to a credibility determination about the insurance company's or plan administrator's reason for denying coverage under a particular plan and a particular set of medical and other records." <u>See</u> <u>id.</u> at 969.

In light of <u>Abatie</u>, both parties, in supplemental briefing, request that their respective motions for summary judgment be construed as motions for judgment under Rule 52, in order that the Court, in applying the proper standard of review under <u>Abatie</u>, may weigh evidence. Because a district court may not weigh evidence when considering a motion for summary judgment, <u>see</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986), but may do so when considering a motion for judgment under Rule 52, <u>see</u> Fed. R. Civ. P. 52(a) (providing court makes "findings of facts and conclusions of law" in action tried without jury), the Court agrees with the parties.

Accordingly, the Court construes the parties' respective motions for summary judgment as motions for judgment under Rule 52.

//

---

[13]The Court notes that even if the documents were considered as part of the administrative record, the outcome would remain unchanged.

### 1. Amount of Deference Due

As defendant concedes, the subject plan is both funded and administered by Liberty Life Assurance Company of Boston.  (See Def.'s Supp. Legal Brief, filed August 3, 2007, at 3:7-9).  Before determining whether a plan administrator with such a "structural conflict of interest," see Abatie, 458 F. 3d at 965, has abused its discretion in denying benefits, a district court must first "determin[e] the degree of deference (if any) it should accord [the plan administrator's] decision."  See Saffon v. Wells Fargo & Co. Long Term Disability Plan, 511 F. 3d 1206, 1216-17 (9th Cir. 2008).

"The level of skepticism with which a court views a conflicted administrator's decision may be low if a structural conflict of interest is unaccompanied, for example, by any evidence of a malice, of self-dealing, or of a parsimonious claims-granting history." Abatie, 458 F. 3d at 968.  On the other hand, a "court may weigh a conflict more heavily, if, for example, the administrator provides inconsistent reasons for denial, fails adequately to investigate a claim or ask the plaintiff for necessary evidence, fails to credit a claimant's reliable evidence, or has repeatedly denied benefits to deserving participants by interpreting plan terms incorrectly or by making decisions against the weight of the evidence in the record."  See id. at 968-69 (internal citations omitted).  Here, neither party offers evidence of defendant's practices or conduct in any other case.  Consequently, the Court, in determining the amount of deference to be accorded, considers only defendant's conduct in its handling of the instant claim for benefits.

In that regard, plaintiff first points to an internal e-mail dated October 15, 1999, in which Nancy Winterer, an employee of defendant who was at that time handling the claim, referred to plaintiff as having a "very high reserve."  (See CF 525.)  Although plaintiff argues such statement evidences defendant's "self-interest," plaintiff offers no evidence to support a finding to that effect.  Plaintiff offers no evidence, for example, that defendant's employees are rewarded for denying claims, or that defendant engaged in a different type of claims investigation herein in light of the "reserve."  Further, at the time the subject comment was made, defendant had been paying plaintiff long-term disability benefits for

two years, and continued, after the comment was made, to pay the claim for approximately eight months; such evidence counsels against a finding that defendant acted in its own self-interest.  See Abatie, 458 F. 3d at 968 (holding "level of skepticism" of defendant's decision may be "low" where there is no evidence of "parsimonious claims-granting history").

Plaintiff also argues that Dr. Mampalam, an examining physician, Dr. Schorn, an outside consultant, and Melvin Attridge, Ph.D. ("Dr. Attridge"), an outside consultant,[14] were "biased and/or unqualified."  (See Pl.'s Supp. Brief, filed August 3, 2007, at 3:7.) Consequently, plaintiff argues, defendant's reliance thereon evidences self-dealing.  In support of this argument, plaintiff asserts that Dr. Mampalam is "unqualified in the field," that Dr. Schorn had not, at the time he issued his report, "practiced medicine" for seven years, and that Dr. Attfield is "essentially" an employee of defendant.  (See id. at 4:3-8.) Plaintiff not only fails to offer evidence to support these assertions, each is contradicted by the very evidence plaintiff offers.  (See attachments to Rosati Decl., filed August 3, 2007 (Dr. Mampalam's curriculum vitae, which includes statement he is "Board Certified in Neurological Surgery"); id. (Dr. Schorn's curriculum vitae, which includes statement he engages in "office practice on occasion")[15]; id. (Dr. Attridge's curriculum vitae, which includes statement he is "clinical and forensic neuropsycholog[ist]" in "private practice").)

Plaintiff's next argument, that defendant engaged in self-dealing by relying on a memorandum provided by Edward P. Crouch, III, M.D. ("Dr. Crouch"), defendant's

//

//

---

[14]Dr. Attridge authored a report on August 12, 2000, in which he included recommendations as to what information might be helpful to defendant in analyzing plaintiff's claim, such as "continue updating treatment notes" and determine if plaintiff "should be involved in active rehabilitation efforts."  (See CF 88.)  Dr. Attridge did not render an opinion as to whether plaintiff was, in fact, able to work.

[15]Plaintiff also fails to explain why, even if Dr. Schorn had retired from the active practice of medicine, Dr. Schorn would, by virtue of such retirement, become unqualified to render medical opinions.

"National Medical Director, Group Market," likewise is unpersuasive.[16]  Plaintiff asserts Dr. Crouch is "biased" because he is employed by defendant.  As the Ninth Circuit has noted, a plan administrator's decision would be entitled to little deference if the administrator relied on the opinion of a physician employee after directing said physician to "use language to support the denial of disability insurance" or did "not allow[ ] [the physician] to request further information or suggest additional medical tests."  See Saffon, 511 F. 3d at 1216.  Here, plaintiff offers no evidence of any conduct resembling the examples set forth in Saffon or, for that matter, any evidence with respect to Dr. Crouch other than the fact of his employment.

Plaintiff also argues defendant failed to consider evidence he submitted.  Again, plaintiff's argument is unsupported by the factual record.  First, plaintiff argues that defendant did not consider certain evidence submitted by plaintiff in support of his appeal.  The Court has already considered and rejected that argument, (see Order, filed August 10, 2005, at 13:21-14:7, 14:27-28), and plaintiff fails to indicate why such finding should be reconsidered.  Second, plaintiff argues defendant failed to consider his award of social security benefits.  Defendant, however, is not bound by the award itself, and defendant did obtain from the SSA and then consider the reports issued by physicians who examined plaintiff in connection with his application for social security benefits.

Plaintiff next asserts defendant did not conduct a fair review of his claim because defendant did not arrange for an independent examination by a psychiatrist.  Although not clearly expressed, plaintiff's argument appears to be that defendant, by not arranging for such an examination, was able to avoid obtaining a report that could have been helpful to plaintiff.  As discussed below, however, plaintiff, in his submissions to defendant, did not claim his pain symptoms were being caused by a psychological condition, and plaintiff points to no statement by his treating psychiatrist to such effect.  Further, to the extent

---

[16]In an internal memorandum written shortly before defendant denied plaintiff's appeal, Dr. Crouch opined that nothing in the file indicates plaintiff suffered from a "cognitive impairment that would preclude all work."  (See CF 93.)

plaintiff might have claimed, at least implicitly, that his disability was caused by a

psychological condition, in addition to pain symptoms caused by a physiological condition,

defendant did receive and review a report from Dr. Kaur, a psychiatrist who conducted an

independent examination of plaintiff in connection with plaintiff's claim for social security

benefits.  As noted, Dr. Kaur opined that plaintiff did not have a psychological condition that

would prohibit him from working, (see CF 491-92), and plaintiff has not argued Dr. Kaur's

opinion was incorrect or otherwise insufficient.  Under such circumstances, plaintiff fails to

show he was subjected to an unfair review by reason of defendant's not having arranged

for a second independent psychiatric examination.

Accordingly, although the Court will consider the structural conflict of interest as a

factor in assessing whether defendant abused its discretion, the Court finds no basis to

afford such factor substantial weight.

**2. Defendant's Exercise of Discretion**

"An ERISA administrator abuses its discretion only if it (1) renders a decision without

explanation, (2) construes provisions of the plan in a way that conflicts with the plain

language of the plan or (3) relies on clearly erroneous findings of fact."  See Boyd v. Bell,

410 F. 3d 1173, 1178 (9th Cir. 2005).  Here, plaintiff does not argue defendant failed to

explain its denial or erred in construing any provision of the plan.  Rather, plaintiff argues,

defendant's decision was based on clearly erroneous findings of fact.

As noted, defendant paid plaintiff's claim for long-term benefits until July 7, 2000, a

date more than 24 months after plaintiff began receiving benefits.  Additionally, as noted,

the plan provides that plaintiff is eligible for long-term benefits if, after 24 months of

receiving benefits, plaintiff is "unable to perform, with reasonable continuity, all of the

material and substantial duties of his own or any other occupation for which he is or

becomes reasonably fitted by training, education, experience, age and physical and mental

capacity."  (See Gray Decl. Ex. A at P-006.)  Accordingly, the issue before the Court is

whether defendant abused its discretion in finding plaintiff could, as of July 7, 2000, perform

with reasonable continuity the material and substantial duties of his own or any other

occupation for which he is reasonably fitted.

"The mere fact that the plan administrator's decision is directly contrary to some evidence in the record does not show that the decision is clearly erroneous." See Snow v. Standard Life Ins. Co., 87 F. 3d 327, 331 (9th Cir. 1996). "That standard certainly does not permit the overturning of a decision where there is substantial evidence to support the decision, that is, where there is relevant evidence that reasonable minds might accept as adequate to support a conclusion even if it is possible to draw two inconsistent conclusions from the evidence." Id. at 331-32 (internal quotation, alteration, and citation omitted).

Here, plaintiff's claim is that, on July 7, 2000, he was unable to engage in work because of disabling pain. As plaintiff puts it, plaintiff "has a well-documented medical condition which results in substantial pain." (See Pl.'s Supp. Brief, filed August 3, 2007, at 5:6.) Defendant found to the contrary, after concluding plaintiff failed to offer sufficient evidence to support his claim. The Court finds, for the reasons stated below, that defendant did not clearly err in so finding.

As noted, the instant plan provides for coverage where the claimant suffers from an "Injury or Sickness." (See Gray Decl. Ex. A at P-006.) In discontinuing plaintiff's benefits, defendant determined there was no "objective evidence to account for [his] continued symptoms" of an assertedly disabling nature. (See CF 073.) A plan administrator is not obligated to accept without question the subjective complaints made by a claimant. See, e.g., Yeager v. Reliance Standard Life Ins. Co., 88 F. 3d 376, 381-82 (6th Cir. 1996) (holding plan administrator did not abuse its discretion in denying application for benefits based on claim of disabling pain, where plaintiff failed to offer evidence of "physical or anatomic abnormality that would cause plaintiff to be totally disabled"); Maniatty v. Unumprovident Corp., 218 F. Supp. 2d 500, 504 (S.D. N.Y. 2002) (holding "acceptance of [a] plaintiff's subjective complaints" is "by no means required of the [plan] administrator"); see also 42 U.S.C. § 423(d)(5)(A) (providing, for purposes of social security benefits, claimant must establish "existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to

produce the pain . . . alleged"). Rather, the plan administrator is entitled to determine whether a physical condition exists that is likely to cause the claimed pain or other subjective symptoms, as well as any other evidence supporting or contradicting the assertion of such symptoms. See, e.g., Jordan v. Northrop Grumman Welfare Benefit Plan, 370 F. 3d 869, 880 (9th Cir. 2004) (holding plan administrator did not abuse its discretion in denying claim, where record included "a number of objective and subjective indications that [claimant's] pain was not so severe as to prevent her from doing her work," including claimant's having engaged in "activities . . . that cut against a determination of severe pain").

Here, defendant's decision essentially rests on a finding that plaintiff did not show an impairment that could be expected to produce the pain alleged. Stated otherwise, defendant, contrary to plaintiff's argument herein, found plaintiff did not, as of July 7, 2000, have a "well-documented medical condition," (see Pl.'s Supp. Brief at 5:6), that could cause disabling pain. Accordingly, because the claim file does not include an assertion by plaintiff that he has a psychological condition that could reasonably be expected to produce pain as a symptom, and plaintiff has made no such contention herein, the Court turns to the question of whether the record presented to defendant contained evidence of a physical condition, existing as of July 7, 2000, that reasonably could be expected to produce disabling pain.

As discussed, plaintiff sustained injuries to the "T11 and T12" area of his thoracic spine after a 1996 automobile accident; said injuries were, according to plaintiff's treating physician, "a herniated disk, or disk bulge," (see CF 1046), and, according to an examining physician, a "rupture," (see CF 494). Thereafter, plaintiff had two back surgeries, the latter of which, in March 1999, was a "posterolateral fusion." (See CF G-17.)

After the second surgery, a physician who examined plaintiff on June 9, 1999, in connection with plaintiff's claim for social security benefits, diagnosed plaintiff with "failed anterior interbody fusion lumbar spine," and opined that plaintiff could not engage in work activities. (See CF 494.) On September 28, 1999, however, a radiologist who consulted at

20

plaintiff's treating physician's request, determined that "anterior interbody fusion appear[ed] solidly incorporated into the superior endplate of T12," (see CF 321), although she did note "[i]ts incorporation into the inferior endplate of T11 [was] indeterminate," (see id.)  On December 3, 1999, plaintiff's treating physician, Dr. Reynolds, advised defendant he did not believe plaintiff could work, because of pain caused by "delayed fusion," and described plaintiff's thoracic spine as "not completely fused."  (See CF 429.)  One month later, however, on January 4, 2000, Dr. Reynolds advised a physician performing an independent review of the claim file that plaintiff's neurological examination was "normal," (see CF 388-89, 392), and the record indicates that, at least as of May 18, 2000, according to plaintiff's treating physician Dr. Moskowitz, plaintiff's thoracic spine had "solidly fused," (see CF 2110).

In sum, although plaintiff's treating physicians and one examining physician found plaintiff's back pain was attributable to a lack of complete fusion at the T11 and T12 levels, there is no evidence or even allegation that such condition continued beyond May 18, 2000.[17]  In his submissions to this Court, plaintiff does not identify a physiological basis for back pain continuing beyond that date.  Because plaintiff asserts such a basis is "well-documented," however, (see Pl.'s Supp. Brief at 5:6), the Court next considers whether any such basis is apparent from the record presented to defendant.

After defendant advised plaintiff, on July 6, 2000, of its initial decision to discontinue payment of long-term disability benefits, and after plaintiff's thoracic spine had "solidly fused," (see CF 2110), Dr. Reynolds offered, on September 26, 2000, the opinion that plaintiff was "severely and totally disabled over the next five years," (see CF G-24).  The only "objective finding" identified by Dr. Reynolds to support his opinion was that, during an examination of plaintiff's back on that date, plaintiff reported "tenderness starting at just

---

[17]Plaintiff does not assert, let alone point to evidence in the record suggesting, that a completely fused thoracic spine could be the source of disabling pain.  Indeed, plaintiff's treating physician Dr. Moskowitz advised defendant he would "decrease" plaintiff's pain medications when plaintiff's back had fused.  (See CF 299.)

21

above the incision and going for another three to four inches," (see CF G-23);[18] Dr. Reynolds did not explain, however, why such "tenderness" would result in an inability to work, let alone for a period of five years. A plan administrator is not required to accept "conclusory" opinions from a treating physician. See Jordan, 370 F. 3d at 880; see also Magallanes v. Bowen, 881 F. 2d 747, 751 (9th Cir. 1989) (holding, in context of application for social security benefits, fact-finder "need not accept a treating physician's opinion which is brief and conclusory in form with little in the way of clinical findings to support its conclusion") (internal quotation and citation omitted). No other "documentation" with respect to a continuing condition is apparent from the record. Under such circumstances, the Court finds defendant did not abuse its discretion in determining plaintiff failed to offer sufficient evidence to show that, as of July 7, 2000, he had a physiological abnormality that reasonably could be expected to cause disabling pain.

To the extent plaintiff called other conditions to defendant's attention, defendant addressed those conditions as well. In particular, defendant found plaintiff was not unable to work as a result of his medications. This finding is supported by substantial evidence, most particularly, the opinion of plaintiff's treating physician, Dr. Moskowitz, who stated on July 26, 2000, that, although he remained of the opinion that plaintiff could not work, the cause was plaintiff's reported pain, and "not because of his medications." (See CF G-8.)[19]

Additionally, to the extent plaintiff's psychological state was noted in plaintiff's medical records, in particular, depression, substantial evidence supports defendant's finding that such mental state had no disabling effect. Specifically, Dr. Kaur, who examined

---

[18]After an earlier examination, conducted June 22, 2000, Dr. Reynolds noted that at the "next visit," x-rays of plaintiff's "T12 area including AP and lateral views" should be taken. (See CF G-21.) There is no indication in the record that such x-rays were taken, or, if they were taken, that a finding was made suggesting an objective basis for Dr. Reynolds' September 26, 2000 opinion that plaintiff could not engage in work for five years.

[19]Dr. Moskowitz did opine that plaintiff's use of medications could be a "potential perceived liability" by employers. (See CF G-9.) The instant plan, however, covers only a person who is disabled, not a person who, while in fact not disabled, is perceived as such. Cf. 42 U.S.C. § 12102(2) (defining, for purposes of Americans with Disabilities Act, "disability" to include "being regarded as" having an impairment that substantially limits major life activity, even though no such impairment actually exists).

plaintiff in connection with his application for social security benefits, opined in September 1999 that plaintiff had "minimal symptoms of depression," and that such symptoms did not "interfere with his working capabilities," (see CF 491-92); plaintiff does not argue that Dr. Kaur's opinion is not substantial evidence, nor even mention such opinion in the instant motion, other than to note its existence. Moreover, plaintiff failed to show that his psychological condition deteriorated in any way thereafter, and, indeed, when defendant asked plaintiff, as part of the appeal process, to submit any evidence of a "cognitive impairment," (see CF 79), plaintiff offered no such evidence.

Consequently, to the extent plaintiff's claim is based on any impediment to his working other than pain, the Court finds defendant did not abuse its discretion in finding plaintiff, as of July 7, 2000, was not disabled.

Accordingly, the Court finds defendant is entitled to judgment on plaintiff's claim for benefits.

**CONCLUSION**

For the reasons stated above:

1. Defendant's motion to strike is hereby GRANTED, and the documents stamped CF 2000-2102 and CF 2115-2127 are hereby STRICKEN.

2. Plaintiff's motion for judgment on his claim for benefits is hereby DENIED.

3. Defendant's cross-motion for judgment on plaintiff's claim for benefits is hereby GRANTED.

**IT IS SO ORDERED.**

Dated: March 20, 2008

MAXINE M. CHESNEY
United States District Judge

23